IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ARCHER DANIELS MIDLAND COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>PAUL SOUCIE,<br><br>Defendant. | ) | 4:08CV3215<br><br>MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

On October 21, 2008, the plaintiff, Archer Daniels Midland Company (ADM), filed a complaint against the defendant, Paul Soucie. (See filing 1.) Generally, the complaint alleges that the defendant breached a contract to sell 25,000 bushels of soybeans to the plaintiff, which caused the plaintiff to suffer a variety of damages. (See generally id.) Now before me is the plaintiff's motion for summary judgment. (See filing 48.) For the following reasons, I shall deny the plaintiff's motion.

## I. BACKGROUND[1]

[1]The facts summarized in this section are taken mainly from the plaintiff's statement of material facts. (See generally Pl.'s Statement of Material Facts, filing 49, at 2-16 (Pl.'s Facts).) The defendant did not respond to the plaintiff's statement of material facts in a manner that conforms with this court's local rules. See NECivR 7.0.1(b)(1)(A), (b)(2)(C); 56.1(b)(1). In particular, the defendant did not submit an affidavit that authenticates the documents that he filed with his index of evidence, see NECivR 7.0.1(b)(2)(C), and he did not file "a concise response to the [plaintiff's] statement of material facts" that "address[es] each numbered paragraph in the movant's statement" while providing pinpoint references to evidence in the case of any disagreements, see NECivR 56.1(b)(1). In accordance with the local rules, I have therefore considered all of the properly referenced material facts set forth in the plaintiff's statements to be admitted unless the defendant's response controverts them with references to properly-authenticated evidence (i.e., the plaintiff's own exhibits). See NECivR 56.1(b)(1).

I note in passing that the defendant's response brief includes references to only one of the

The plaintiff is engaged in the business of buying, selling, and processing grain crops, including soybeans. (Pl.'s Facts, ¶ 1.) For 32 years, the defendant has been engaged in the business of "producing, custom harvesting and selling grain crops, including soybeans[,] for profit." (Id. ¶ 2; see also id. ¶¶ 4-19.)

On or about September 14, 2007, the defendant telephoned Jeffrey Berggren, who served as the plaintiff's Producer/Marketing Director. (Pl.'s Facts ¶ 21; Pl.'s Index, filing 50, Ex. 2, Berggren Aff. ¶¶ 3, 5.) During this call, the defendant offered to sell to the plaintiff 25,000 bushels of soybeans at a price of $9.90 per bushel, with delivery to be made between June 1, 2008, and July 31, 2008, at the plaintiff's processing facility in Lincoln, Nebraska. (Pl.'s Facts, ¶ 21.) The proposed transaction was in the form of a hedge-to-arrive agreement, which would allow the defendant "to lock-in a referenced commodity futures price and allow for possible basis appreciation," and also "allow for 'rolling' of reference prices[,] thus allowing the [defendant] to store the grain into a deferred month within the crop year to capture favorable carry in the futures market or basis improvement in the cash market." (Id. ¶ 20.) Berggren states that he "accepted and booked" the defendant's offer. (Pl.'s Index, filing 50, Ex. 2, Berggren Aff. ¶ 5.) Berggren does not state, however, that he informed the defendant that his offer was accepted. Instead, Berggren claims only that his "standard practice and procedure" would have been to confirm the plaintiff's acceptance of the defendant's offer during their phone conversation. (Pl.'s Index, filing 50, Ex. 2, Berggren Aff. ¶ 5.) The defendant states that he does not recall Berggren saying that he accepted the offer; instead, he recalls Berggren saying only that he (Berggren) "would send out a contract." (Pl.'s Index, filing 50, Ex. 3, P. Souce Dep. at 56:23-57:19.)

Sometime after September 14, 2007, one of the plaintiff's representatives mailed to the defendant a written memorandum that set forth the "material terms" of the hedge-to-arrive agreement that Berggren and the defendant discussed during their telephone conversation. (Pl.'s Facts, ¶ 22; see also Pl.'s Index, filing 50, Ex. 2-B.) The memorandum, which is titled "ADM

---

six exhibits included in his index of evidence. (Compare Def.'s Br., filing 57, with Def.'s Index of Evidence, filing 59.) Therefore, even if the defendant's exhibits had been properly authenticated, I would have had no reason to consider most of them. See, e.g., Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004) (discussing the importance of specificity in summary judgment response briefs).

Processing Grain Purchase Contract Confirmation," contains several terms and conditions on its reverse, including the following:

> 1. Receipt of this Contract by you is an acknowledgment of acceptance of all terms and conditions herein unless immediate notice is sent to us advising of any errors. All agreements between the parties hereto must be in writing, and this Contract is a final expression of the agreement between the parties. Any confirmation by you that is inconsistent with or in addition to the terms and conditions herein shall not be binding unless we expressly approve the inconsistent or additional terms in writing.

(Pl.'s Index, filing 50, Ex. 2-B.) Berggren states that to his knowledge, the defendant did not make a written response or objection to this Grain Purchase Contract Confirmation. (Pl.'s Facts, ¶ 25.) As will be discussed below, however, the evidence indicates that the defendant did not receive this Grain Purchase Contract Confirmation. (E.g., id. ¶ 27.) Also, I note in passing that there is evidence of at least one discrepancy between the terms of the Grain Purchase Contract Confirmation and the terms that Berggren and the defendant discussed over the telephone. (Compare Pl.'s Index, filing. 50, Ex 2-B (stating that one futures roll would be allowed for a $0.04 charge) with Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 58:20-59:25 (stating that the defendant understood that the one time roll would be allowed at $0.02). See also Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 60:21-61:4.)

On or about September 15 or 16, 2007, the defendant spoke with Andy Fiala, a FuturesOne broker, and said that he had agreed to sell to the plaintiff 25,000 bushels of soybeans at $9.90 per bushel, with delivery between June 1, 2008, and July 31, 2008, with a "one time roll of 2 cents." (Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 58:4-59:6.) At the time, the defendant was committed to the oral hedge-to-arrive agreement "as long as the conditions that we agreed to [during the telephone conversation on September 14] showed up on a contract." (Id. at 58:11-17.)

On or about September 16 or 17, 2007, the defendant called Berggren to say that he had not received "a contract." (Pl.'s Index, Ex. 3, P. Soucie Dep. at 69:2-22.) Berggren replied, "[W]ell, we'll get one out to you." (Id. at 69:22.)

Sometime within the two weeks following his September 14 telephone conversation with Berggren, the defendant commented to his brokers at FuturesOne that he had not received written

confirmation of the hedge-to-arrive agreement. (Pl.'s Facts, ¶ 27.) One of these brokers, Joel Wesely, told the defendant that FuturesOne would call the plaintiff and "try to get them to resend it out." (Id. (quoting Pl.'s Index, filing 50, Ex. 6, Wesely Dep. at 14:22-25).) Although there is evidence that the brokers obtained the contract number associated with the Grain Purchase Contract Confirmation, (see Pl.'s Facts ¶ 28), it appears that the defendant was not provided with a copy of the contract confirmation.

In June 2008, the delivery window specified in the hedge-to-arrive agreement opened, and Wesely telephoned the defendant to tell him that the basis needed to be set. (Pl.'s Facts, ¶ 30.) Wesely recalls that in response, the defendant "basically just kind of said okay. He didn't say yes or no or anything, he was just like okay." (Pl.'s Index, filing 50, Ex. 6, Wesely Dep. at 19:7-9.) Wesely spoke with the defendant again within a couple of weeks, and on this occasion the defendant stated that he "still never got a contract and that he didn't have anything to deliver." (Id. at 19:13-20.)

On or about July 1, 2008, the defendant, Fiala, and Berggren participated in a telephone conference call to discuss "whether the defendant intended to roll the time for delivery of the soybeans forward, or by agreement with [the plaintiff], establish a basis level for final pricing." (Pl.'s Facts, ¶ 31.) According to Berggren, the defendant agreed during this call to lock in a final basis level at "'-60n' or -0.60000." (Pl.'s Index, filing 50, Ex. 2, Berggren Aff. ¶ 11.) According to the defendant, Berggren did state that "they were 60 under" on the basis figure, but the defendant replied that he did not have a hedge-to-arrive contract with the plaintiff because he never received the written contract, and he stated that even if he had a contract with the plaintiff, he "would not roll it." (Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 77-79.)

After the July 1, 2008, telephone conference call, the plaintiff mailed to the defendant a "Grain Purchase Contract Pricing Confirmation." (Pl.'s Index, filing 50, Ex. 2, Berggren Aff. ¶ 12.) The Grain Purchase Contract Pricing Confirmation included the following terms on its reverse side, among others:

> 1. Receipt of this Contract by you is an acknowledgment of acceptance of all terms and conditions herein unless immediate notice is sent to us advising of any errors. All agreements between the parties hereto must be in writing, and this Contract is a final expression of the agreement between the parties. Any

> confirmation by you that is inconsistent with or in addition to the terms and conditions herein shall not be binding unless we expressly approve the inconsistent or additional terms in writing. Any objection to this Contract must be provided to ADM within ten (10) days of your receipt.

(Pl.'s Index, filing 50, Ex. 2-D.) Berggren states that, to his knowledge, the defendant did not send "immediate notice" to the plaintiff regarding any errors in the Grain Purchase Contract Pricing Confirmation, and he adds that the defendant did not provide a written objection within ten days of his receipt of it. (Pl.'s Index, filing 50, Ex. 2, Berggren Aff. ¶ 14.) The defendant states that he received the Grain Purchase Contract Pricing Confirmation and that he called Berggren immediately upon his receipt of the document to object to the basis and the hedge fee. (Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 83-84, 88-89.) The defendant states further that in response to these objections, Berggren said that he "guessed" that the plaintiff might be able to alter the terms of the Grain Purchase Contract Pricing Confirmation. (Id. at 89-90.) The plaintiff never provided the defendant with written confirmation of any changes, however. (Id. at 90.)

On or about August 15, 2008, Berggren mailed a letter to the defendant. (Pl.'s Facts, ¶ 37 (citing, inter alia, Pl.'s Index, filing 50, Ex. 2, Berggren Aff. ¶ 15).) In this letter, Berggren sought the defendant's assurance that he would deliver 25,000 bushels of soybeans pursuant to the terms of the hedge-to-arrive agreement and warned the defendant that he would be "subject to cancellation fees" if the soybeans were not delivered by August 31, 2008. (Pl.'s Index, filing 50, Ex. 2-E.) Berggren also invited the defendant to telephone him with any questions. (See id.) The defendant received this letter, (Pl.'s Facts, ¶ 38), but did not respond to it in writing, (id. ¶ 39). The defendant states, however, that just prior to his receipt of this letter, Berggren called him on the telephone and said that "he was expecting delivery of those beans." (Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 92:20-93:5.) The defendant replied that he would not deliver them because he did not have a contract with the plaintiff. (Id. at 93:6-8.)

On or about September 12, 2008, Berggren mailed a letter to the defendant stating that the plaintiff's contract with the defendant was cancelled and demanding that the defendant make a payment of $96,937.50 to the plaintiff by September 22, 2008. (Pl.'s Facts, ¶ 40 (citing, inter

alia, Pl.'s Index, filing 50, Ex. 2, Berggren Aff. ¶ 19).)[2] The defendant received the September 12 letter, but he did not make a written response to it. (Id. ¶¶ 41-42.) Neither, evidently, did the defendant make the payment demanded in the letter. The plaintiff then filed the instant lawsuit, claiming that it "has fully performed its obligations pursuant to the hedge-to-arrive agreement . . . to the extent required of it," while the defendant "has failed and refused to perform his obligations pursuant to the hedge-to-arrive agreement." (Id. ¶¶ 43-44. See also Compl., filing 1, ¶ 16.)

## II. STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, then the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," Anderson, 477 U.S. at 257, and "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," id. at 256 (citing Fed. R. Civ. P. 56(e)).

---

[2]The amount demanded by the plaintiff comprises the difference between the cost of soybeans specified in the hedge-to-arrive contract ($9.90 per bushel) and the cost that the plaintiff paid to procure replacement soybeans on the open market ($13.5775 per bushel)–which comes to $3.6775 per bushel–plus an additional $0.20 per bushel cancellation fee. (See Pl.'s Facts, ¶¶ 45-47.)

## III. ANALYSIS

The plaintiff's summary judgment brief raises four main issues: 1) whether a contract was formed between the parties; 2) whether the defendant has waived the statute of frauds defense; 3) whether an exception to the statute of frauds applies; and 4) whether certain of the defendant's arguments are precluded under the parol evidence rule. My analysis of each of these issues is set forth below.

### A. Whether a Contract Was Formed

The plaintiff argues first that there is no genuine issue as to whether a contract was formed between the parties. (See Pl.'s Br., filing 49, at 20-22.) Although the plaintiff's argument is somewhat unclear, I take it that the plaintiff claims that a contract was formed at the time of the initial telephone conversation between Berggren and the defendant, and that this contract does not lack definiteness even if certain terms were left open. (See id. at 20-21 (citing, inter alia, Neb. Rev. Stat. U.C.C. § 2-204); see also id. at 19 ("Plaintiff . . . submits that it entered into an oral hedge-to-arrive agreement with defendant . . . on September 14, 2007 when Soucie telephoned ADM . . . .").)[3] In response, the defendant does not dispute the definiteness of the alleged contract. He argues, however, that there is a genuine issue as to whether an agreement was formed between the parties. (See Def.'s Br., filing 57, at 3.) More specifically, he argues that the plaintiff never properly accepted his offer because it failed to provide him with a timely written confirmation of the oral agreement; that the plaintiff made a counter-offer, as opposed to an acceptance, by altering terms of the defendant's original offer; and that the defendant promptly rejected the terms of the Grain Purchase Contract Pricing Confirmation that he received in July 2008. (See id. at 4-6.)

The parties agree that the Uniform Commercial Code governs this case. (See Pl.'s Br., filing 49, at 20; Def.'s Br., filing 57, at 3.) The U.C.C. provides that "[a] contract for sale of

---

[3]The plaintiff does identify any specific open terms in the alleged contract. The evidence indicates, however, that the basis was left open following the initial telephone conversation between Berggren and the defendant, and that some effort was made to set the basis in July 2008.

I note parenthetically that the plaintiff's argument also includes a passing reference to the statute of frauds, (see Pl.'s Br. at 22), but I shall analyze this issue in a separate section below.

goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Neb. Rev. Stat. U.C.C. § 2-204(1). Also, "[a] contract may be found in the bargain of the parties by their language or by implication from other circumstances, such as course of dealings or usage of trade." Nebraska Builders Products Co. v. Industrial Erectors, Inc., 478 N.W.2d 257, 265 (Neb. 1992). In Nebraska Builders, the Nebraska Supreme Court held that the parties' conduct supported a finding that a contract existed between them despite Nebraska Builders' refusal to provide Industrial with a written contract. The court summarized the relevant facts and explained its holding as follows.

> Industrial submitted an oral proposal to Nebraska Builders to supply cranes for [an Omaha Public Power District] service center in telephone calls on March 10, 1985, and on March 12 or 13. Later, Industrial confirmed [its] offer in a letter dated March 26, 1985, written to Hawkins [of Nebraska Builders] by Brennan, [who served] as sales manager of Industrial. That letter consisted of seven pages and was quite explicit. . . .
>
> Nebraska Builders relied on the bid contained in the telephone calls and letter in submitting its own bid as a material supplier on the project. Immediately after Hawkins learned that Nebraska Builders' bid had been accepted by the general contractor, Hawkins stated, he called Industrial and accepted the offer. Brennan, however, denies his having this telephone conversation.
>
> A review of the facts in a light most favorable to Industrial, the prevailing party, would support a finding that the offer was never orally accepted by telephone. However, Industrial's conduct in submitting the information and shop drawings and the correspondence between Industrial and Nebraska Builders concerning the variance approval contradicts such a finding. In addition, Brennan also visited Nebraska Builders' office on August 8, 1985, almost 5 months after the alleged agreement was made, to answer questions on the crane systems that Industrial would supply. The written proposal, the exchange of information on the project, and the oral conversations between Nebraska Builders and Industrial manifest the intent that a contract existed between the parties.

478 N.W.2d at 265.

The plaintiff cites Nebraska Builders for the proposition that a contract may be found to exist even if the parties have failed to enter into a written agreement, and I infer that the plaintiff means to suggest that in the instant case, as in Nebraska Builders, the parties' conduct demonstrates recognition of the existence of a contract. (See Pl.'s Br., filing 49, at 21-22.) I am

not persuaded, however, that the facts of Nebraska Builders are analogous to those of the instant case. Unlike Nebraska Builders, here there is scant evidence of writings, information exchanges, or oral conversations that "manifest the intent that a contract existed between the parties." 478 N.W.2d at 265. On the contrary, when the evidence is viewed in a light favorable to the defendant, it appears that 1) the plaintiff did not accept the defendant's offer orally during the September 14, 2007, telephone call; 2) the plaintiff did not provide the defendant with a written contract confirmation in September 2007, despite requests from the defendant and his brokers, and despite the plaintiff's own requirement that "[a]ll agreements between the parties . . . must be in writing"[4]; 3) the plaintiff varied the terms of the defendant's offer and disregarded the defendant's objections to those variations when he discovered them in the July 2008 contract pricing confirmation; and 4) the defendant consistently maintained that he had no binding contract with the plaintiff in the absence of a written agreement. I find, therefore, that there is a genuine issue whether a contract was formed between the parties on September 14, 2007.

Although the section of the plaintiff's brief devoted to the issue of contract formation includes no references to specific words, circumstances, or conduct that might show that the defendant recognized the existence of a contract, (see Pl.'s Br., filing 49, at 20-22), a later section of the brief–wherein the plaintiff discusses the "admissions exception" to the statute of frauds–does include citations to evidence purporting to show that the defendant admitted to entering into a contract with the plaintiff during his September 14, 2007, telephone conversation with Berggren. (See Pl.'s Br., filing 49, at 27-32; see also Pl.'s Reply Br., filing 62, at 3-6.) I discuss this evidence more thoroughly in my analysis of the statute of frauds exception, which is set forth below in Part III.B. Generally, the plaintiff's evidence consists of excerpts of the defendant's deposition testimony that, when read in context, show that the defendant held the position that his "deal," "agreement," or "commitment" with the plaintiff depended upon his receipt of a written contract that included the agreed-upon terms. (See, e.g., Pl.'s Index, filing 50, Ex. 3, Soucie Dep. at 58-60, 63-64.) The alleged admissions cited by the plaintiff are not analogous to the words and conduct that supported the court's holding in Nebraska Builders.

[4](See Pl.'s Index, filing 50, Exs. 2-B, 2-D.)

In summary, the plaintiff has not convinced me that the defendant's conduct or words demonstrate recognition of the existence of a contract. Therefore, a genuine issue remains as to whether a contract was formed between the parties.

**B. The Statute of Frauds**

Nebraska's statute of frauds provides that, unless an exception applies, "a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." Neb. Rev. Stat. U.C.C. § 2-201(1). The plaintiff acknowledges that the facts of this case implicate the statute of frauds, but it argues that the defendant has waived the statute of frauds defense by failing to plead it in his answer. (See Pl.'s Br., filing 49, at 19, 22-23.) Alternately, the plaintiff argues that one or more exceptions to the statute of frauds apply in this case. (See id. at 19-20, 24-32.) I shall consider each of the plaintiff's arguments in turn.

1. Whether the Defendant Has Waived the Statute of Frauds Defense

The plaintiff argues that the defendant has waived the statute of frauds defense because he failed to plead the defense in his answer. (See Pl.'s Br., filing 49, at 22-23.) I disagree.

Federal Rule of Civil Procedure 8(c) provides, "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . statute of frauds." "Generally, failure to plead an affirmative defense results in a waiver of that defense." Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 715 (8th Cir. 2008) (quoting First Union Nat'l Bank v. Pictet Overseas Trust Corp., 477 F.3d 616, 622 (8th Cir. 2007)). "However, 'when an affirmative defense is raised in the trial court in a manner that does not result in unfair surprise, technical failure to comply with Rule 8(c) is not fatal.'" Id. (quoting First Union Nat'l Bank, 477 F.3d at 622); see also First Union Nat'l Bank, 477 F.3d at 622 n.5 (citing cases); Stoebner v. Parry, Murray, Ward & Moxley, 91 F.3d 1091, 1093-94 (8th Cir. 1996) (holding that, in the absence of prejudice to the opposing party, an affirmative defense raised for the first time in a summary judgment motion is not waived). Furthermore, a district court need not require the formality of an amended answer when exercising its discretion to allow a party to raise an affirmative defense that was not pleaded in accordance with Rule 8(c). See Sanders v. Dep't of

the Army, 981 F.2d 990, 991 (8th Cir. 1992) (per curium).

In this case, the defendant did not plead the statute of frauds defense in its answer, (see generally filing 20), and it appears that the defendant first raised the statute of frauds defense in its response to the plaintiff's summary judgment motion, (see Def.'s Br., filing 57, at 6-13). Unless the plaintiff can show that it was prejudiced by the defendant's failure to raise the defense in his answer, however, I shall not deem the defense waived.

The plaintiff argues that it will suffer prejudice because "discovery has been planned and taken under the assumption that the statute of frauds was not a viable issue." (Pl.'s Br., filing 49, at 23.) The plaintiff concedes, however, that it "obviously contemplated the potential for the defense when crafting its complaint." (Id.) It is apparent that the plaintiff also contemplated the defense when drafting its summary judgment brief, which includes not only an argument that the defense has been waived, but also a number of arguments about the applicability of certain exceptions to the statute of frauds. (See generally id. at 24-32.) I note also that the plaintiff's substantive arguments about the defense and its exceptions are supported by references to discovery materials. This seems to belie the plaintiff's assertion that it conducted discovery under the assumption that the statute of frauds was not a viable issue. In short, the plaintiff anticipated the applicability of statute of frauds defense, I am not persuaded that the plaintiff would be prejudiced if the defendant were allowed to pursue the defense.

2. Whether an Exception to the Statute of Frauds Applies

The plaintiff argues that the parties' agreement is enforceable, despite the absence of a "sufficient" written instrument signed by the defendant, under any one of three statutory exceptions to the statute of frauds. The first of these exceptions states,

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) [i.e., the formal requirements of the statute of frauds] against such party unless written notice of objection to its contents is given within ten days after it is received.

Neb. Rev. Stat. U.C.C. § 2-201(2)(a). The plaintiff argues that this exception is satisfied because 1) the parties are both "merchants" within the meaning of this subsection; 2) the defendant admitted to receiving the July 1, 2008, Grain Purchase Contract Pricing Confirmation; 3) the

defendant had reason to know the contents of this document; and 4) the defendant did not give the plaintiff written notice of objection to the contents of the document within ten days of its receipt. (Pl.'s Br., filing 49, at 25.) In response, the defendant does not dispute that he is a "merchant," nor does he dispute that he received the July 1, 2008, contract pricing confirmation and had reason to know its contents. (See Def.'s Br., filing 57, at 9-10.) He argues, however, that he did not receive written confirmation of the contract "within a reasonable time." I agree.

In Kimball County Grain Co-op v. Yung, 263 N.W.2d 818, 820 (Neb. 1978), the Nebraska Supreme Court held that a written confirmation that was received more than six months after the parties made an oral contract to sell 15,00 bushels of wheat was not received "within a reasonable time" for the purposes of U.C.C. section 2-201(2). In Yung, the plaintiff offered no excuse for the six-month delay, and the court observed that "the written contract was delivered to the defendant only 1 day before the final possible date of delivery under the oral contract." 263 N.W.2d at 820. The court found that under these circumstances, and in light of the basic purposes of section 2-201(2),[5] there was "no doubt that the defendant in this case did not receive a writing in confirmation of the oral contract within a reasonable time." Id.

In the instant case, the parties allegedly entered into an oral contract on September 14, 2007, and the defendant did not receive a writing in confirmation of the contract until sometime after July 1, 2008. There is evidence that the plaintiff was informed repeatedly that the defendant did not receive a written confirmation of the agreement, yet the plaintiff has offered no excuse for the delay. The evidence also indicates that because of the nine-month delay, the defendant did not receive a written confirmation of the agreement until after the delivery window contemplated by the parties had opened. Under the circumstances, I am not persuaded that the requirements of section 2-201(2)(a) are satisfied.

A second exception to the statute of frauds states,

---

[5]The court stated, "The purpose of subsection (2) of section 2-201, U.C.C., was to put professional buyers and sellers on an equal footing by changing former law under which a party who received a written confirmation of an oral agreement of sale, but who himself had not signed anything, could hold the other party to the contract without himself being bound." Yung, 263 N.W.2d at 820 (citations omitted).

> Between a merchant and a buyer or seller of grain not a merchant, if (i) the contract is an oral contract for the sale of grain, (ii) within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received, (iii) the party receiving it has reason to know its contents, (iv) it contains a statement of the kind of grain, quantity of grain, per unit price, date of contract, and delivery date of the grain, and (v) notice appears on the face of the written confirmation stating that the contract will be enforceable according to the terms contained in the confirmation unless written notice of objection is given within ten days, the writing satisfies the requirements of subsection (1) of this section against the party receiving it unless written notice of objection to its contents is given within ten days after it is received.

Neb. Rev. Stat. U.C.C. § 2-201(2)(b). The plaintiff argues that the elements of this subsection are satisfied "[f]or the same reasons and based on the same evidence" that support its argument that subsection (2)(a) is satisfied. (Pl.'s Br., filing 49, at 25.) Because the July 1, 2008, Grain Purchase Contract Pricing Confirmation was not received by the defendant within a reasonable time of the September 14, 2007, telephone conversation between Berggren and the defendant, I must reject the plaintiff's argument.

Finally, the plaintiff argues that the circumstances of this case satisfy U.C.C. § 2-201(3)(b), which states, "A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable . . . if the party against whom enforcement is sought admits in his or her pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted." Again, I disagree.

Section 2-201(3)(b) contains at least three requirements: "There must be an admission; the admission must be made by the party against whom enforcement of the oral contract is sought; and the admission must be made in court." Nebraska Builders Products Co. v. Industrial Erectors, Inc., 478 N.W.2d 257, 268 (Neb. 1992). "The statutory requirement can be satisfied by way of pleadings, bills of particulars, depositions, affidavits, admissions pursuant to notices to admit, and oral testimony, including admissions made on cross-examination." Id. (citation omitted). Also, an admission within the meaning of § 2-201(3)(b) can be made either explicitly or by testimony "to facts which as a matter of law establish that a contract was formed." Id. (citation omitted). An admission is not made, however, "whenever the defendant utters the

magic words contract or agreement." Id. at 269. The Nebraska Supreme Court explains, "We acknowledge the possibility that laypeople might misuse legal terminology. We therefore suggest that if a party denying the existence of a contract uses contract terminology, the court should look at the other evidence presented by the defendant." Id. In Nebraska Builders, for example, the record included evidence showing that, in addition to using the word "contract," Industrial's sales manager "admitted submitting variance approval documents to Nebraska Builders shortly after the alleged agreement occurred," "admitted that he sent a letter advising Nebraska Builders that Industrial would adhere to the specifications," and "testified that he visited Omaha and was looking for more commitment from Nebraska Builders in the form of a letter of intent or purchase order." Id. In light of the sale's manager's conduct, the court considered his testimony concerning the "contract" to be an admission "and not an inadvertently mistaken use of legal terminology." Id.

In support of its argument that the defendant has admitted that a contract for sale was made, the plaintiff refers me first to the following excerpt of the defendant's deposition testimony:

> Q Okay. Is it - - Tell me why you don't think that you have a binding agreement with ADM.
>
> A Because I never received a contract. I called them back and asked them once myself, and then never - - and I told them at the time that if I didn't get a written contract, that we didn't have any kind of agreement, so I wanted a contract.
>
> Q So your position - -
>
> A Because over time everybody's memory fades on who did - - what the conditions and terms were of it.
>
> Q Okay. So your belief is, is that you don't have a binding agreement with ADM because you didn't receive this confirmation in the mail?
>
> A Yeah, I didn't receive - - I never received a contract.
>
> Q Is there any other reason why you don't believe you had an agreement with ADM, other than the fact that you didn't get this written confirmation?

A That's - - No, that's - -

(Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 50:4-22. See also Pl.'s Br., filing 49, at 27.) I am not persuaded that this testimony amounts to an admission by the defendant that a contract was made.

Next, the plaintiff refers me to its request for admission number 18, and the defendant's response to that request:

> REQUEST NO. 18: Admit that on or about September 14, 2007, you placed a telephone call to plaintiff to sell twenty-five thousand (25,000) bushels of soybeans to plaintiff at a price of $9.90 per bushel for delivery between June 1, 2008 and July 31, 2008 pursuant to an HTA contract.
>
> RESPONSE: Admit. Placed call for sale but never received confirmation of sale.

(Pl.'s Index, filing 50, Ex. 7, Def.'s Response to Pl.'s First Set of Requests for Admission at 3. See also Pl.'s Br., filing 49, at 28.) Although the response, "Admit," standing alone, could be interpreted as an admission that an HTA contract was formed on September 14, 2007, the defendant's qualification of his admission, taken together with other evidence showing that the defendant did not consider a contract to be formed absent a written confirmation, indicates that the defendant's response should not be interpreted in that fashion.

Next, the plaintiff refers me to a pair of excerpts from the defendant's deposition and one of the defendant's responses to the plaintiff's request for admissions–all of which relate to a conversation between the defendant and a broker at FuturesOne. (See Pl.'s Br., filing 49, at 28-29.) The defendant's response to the plaintiff's request for admissions number 22 states, "On or about September 15 or 16 I talked to Joel at FuturesOne and told him I was selling on cash contract soybeans and I committed to a price first contract, or HTA with ADM." (Pl.'s Br., filing 49, at 29 (quoting Pl.'s Index, filing 50, Ex. 7, Def.'s Response to Pl.'s First Set of Requests for Admission at 4).) When questioned about this admission in his deposition, the defendant first clarified that on September 15 or 16 he spoke with "Andy," rather than "Joel," at FuturesOne. (Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 58:4-57:23-58:3.) Counsel and the defendant then had the following exchange, which the plaintiff highlights in its summary judgment brief:

Q Okay. Let's say it's Andy. So within a day or two of having had this conversation with Berggren, you tell Andy at Futures One that you had

committed to a price first contract or HTA with ADM, right?

A Right, that's when we just - - they - -

Q I just want you to answer the question.

A. Yes.

Q Okay. Now, that seems to me to suggest that when you called him and talked to him, that even though you may not have had the confirmation in the mail, that you had committed based on your offer to this HTA with ADM, is that correct?

A I would say, yes, as long as the conditions that we agreed to showed up on a contract - -

Q Okay.

A - - which never happened.

Q All right. But the conditions that you agreed to with ADM over the telephone, this is with Berggren, was for 25,000 bushels of soybeans at 9.90 per bushel for delivery between June 1, 2008, and July 31st of 2008?

A With the one time roll of 2 cents.

Q All right. Those were all of the terms?

A Those were the terms we discussed.

Q Okay. Well, actually those were the terms you agreed to orally before you had this conversation with Andy at Futures One, right?

A Right.

(Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 58:4-59:6. See also Pl.'s Br., filing 49, at 28-29.) It should be noted that counsel then followed up with the question, "And again, I think I understand your position here, but I want to make sure that I do. You seem to be taking the position that because you didn't get this confirmation in the mail, that you didn't have a deal?" (Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 60:16-19.) The defendant responded, "Correct." (Id. at 60:20.) Thus, it appears that the questioner understood the defendant's position to be that

there was no contract in the absence of a written confirmation, notwithstanding the defendant's use of "magic words" such as "committed" and "agreed to." Nebraska Builders, 478 N.W.2d at 269.

As noted above, the plaintiff has referred me to a second excerpt from the defendant's deposition that relates to the defendant's conversation with Andy at FuturesOne. (Pl.'s Br., filing 49, at 29 (citing Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 63:17-64:2).) The plaintiff emphasizes the following questions and answers:

> Q Okay. So when you made this telephone call to - - or Andy called you on the 15th, 16th or the 17th, a couple of days after your conversation with Berggren, why did you tell him you had committed to a price first contract or hedge to arrive contract with ADM?
>
> A Because I thought we had a deal going. And I told him at the time that I hadn't received a contract yet.
>
> Q So on the 15th, 16th or 17th, you thought you had an agreement with ADM?
>
> A. Uh-huh, yes.

The exchange continued as follows, however:

> Q Okay. And did you express anything to - -
>
> A We had a discussion, put it that way. Until - - We don't have an agreement until we had the contract, so - -
>
> Q Well, you had an oral agreement until - - with Jeff, didn't you?
>
> A Yeah, but I didn't have any contract or confirmation, so - -
>
> Q Okay. You didn't have the confirmation in writing, right?
>
> A Right. I agree, until I have that, I don't have a deal.

(Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 64:3-14.)

It seems to me that when the defendant's testimony about his conversation with Andy is taken in its totality, it does not amount to an admission of the existence of a legal contract. Rather, it shows that the defendant believed that he had established the terms of an agreement

with Berggren, and that this agreement would be formalized upon the defendant's receipt of a written confirmation of those terms.

Finally, the plaintiff refers me to the following excerpt from the defendant's deposition:

Q Hang on a second. You didn't say to [Berggren on September 14] that as a condition of our oral agreement here, that I have to have specifics in writing before I'm agreeing? You didn't say that to him, did you?

A No.

(Pl.'s Br., filing 49, at 30 (citing Pl.'s Index, filing 50, Ex. 3, P. Soucie Dep. at 64:21-25).) The plaintiff argues that this testimony establishes that the defendant did not make "receipt of a written contract a condition of the original deal with ADM when it was negotiated on September 14, 2007." (Id.) But evidence that the defendant did not raise this condition himself during this particular conversation does not establish that the defendant's receipt of a written confirmation was not prerequisite to the formation of a contract between the parties.[6] More to the point, it does not follow from the fact that the defendant did not raise this condition on September 14, 2007, that the defendant has admitted to the formation of a contract on that date.

In summary, defendant did make statements in his deposition and in responses to requests for admissions that, when considered in isolation, appear to be admissions that a contract was formed between the parties. The Nebraska Supreme Court instructs, however, that when a party uses contract terminology but denies the existence of a contract, other evidence should be considered to determine whether that party simply misused legal terms. Nebraska Builders, 478 N.W.2d at 268-69. I find that in this case, the evidence shows that the defendant used legal terminology mistakenly or inadvertently, and he has not admitted to the formation of a contract on September 14, 2007. In short, the plaintiff has failed to persuade me that section 2-201(3)(b) is applicable.

Because none of the exceptions to the statute of frauds cited by the plaintiff applies, I must reject the plaintiff's argument that an enforceable contract exists between the parties, and I

---

[6]Indeed, the plaintiff claims to have sent out a written contract confirmation in September 2007 that includes the term, "All agreements between the parties hereto must be in writing." (Pl.'s Facts, ¶ 22; see also Pl.'s Index, filing 50, Ex. 2-B.)

must deny the plaintiff's motion for summary judgment.

C. **The Parol Evidence Rule**

The plaintiff argues that the defendant should not be allowed to offer evidence that the terms of the alleged agreement between the defendant and Berggren differed from the terms reflected in Berggren's handwritten notes, in the Grain Purchase Contract Confirmation of September 2007, or in the Grain Purchase Contract Pricing Confirmation of July 1, 2008. (Pl.'s Br., filing 49, at 32-33.) The plaintiff's argument is based on the parol evidence rule, which states, "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." Cosgrove v. Mademoiselle Fashions, 292 N.W.2d 780,784-85 (Neb. 1980) (quoting 3 Corbin on Contracts § 573). Before the parol evidence rule may be applied, then, the plaintiff must show that "the parties have executed a completely integrated written document purporting to express the terms of their agreement." Rowe v. Allely, 507 N.W.2d 293, 296 (Neb. 1993). In this case, the evidence does not establish that both parties executed, or otherwise assented to, a written agreement. Indeed, the plaintiff is seeking to enforce an oral agreement that it allegedly reached with the defendant on September 14, 2007, (see, e.g., Pl.'s Br., filing 49, at 34), and, as I explained above, there remains a genuine issue as to whether an oral contract was formed between the parties. Under the circumstances, I must reject the plaintiff's argument that the parol evidence rule bars the defendant's evidence of variations between the terms of the alleged oral agreement and the terms of the written contract confirmations mailed by the plaintiff in September 2007 and July 2008.

In his response to the plaintiff's motion for summary judgment, the defendant raises a number of arguments about the nature and amount of damages claimed by the plaintiff. (See Def.'s Br., filing 57, at 13-20.) Because I have concluded that the plaintiff is not entitled to summary judgment, these arguments need not be addressed at this time.

**IT IS ORDERED** that the plaintiff's motion for summary judgment, filing 48, is denied.

Dated July 28, 2009.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge