IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ARCHER DANIELS MIDLAND COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | 4:08CV3215 |
| v. | ) ) | |
| PAUL SOUCIE, | ) ) | MEMORANDUM OF DECISION |
| Defendant. | ) ) ) | |

　　　　This action is based on allegations that the defendant, Paul Soucie, breached a contract to sell 25,000 bushels of soybeans to the plaintiff, Archer Daniels Midland Company (ADM).  (See generally Compl., filing 1.)  The central issues are "contract formation and any related defenses." (Memorandum and Order, filing 70, ¶ 2a.)  This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.  A non-jury trial was held before me on September 11, 2009, and the case has been submitted to me for decision.[1]  My decision and the reasons supporting it, including the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52, are set forth below.  Though I have organized many of my findings of fact under the "background" heading, additional findings of fact are stated under subsequent headings of this memorandum.


## I.   BACKGROUND

　　　　The plaintiff is an experienced buyer, seller, and processor of soybeans, (Ex. 1, Berggren Aff. ¶ 3), and the defendant is an experienced producer, custom harvester, and seller of soybeans, (e.g., Ex. 2, P. Soucie Dep., at 38:20-42:25; Ex. 7, Def.'s Response to Pl.'s Requests for

---

[1]At trial, the parties submitted a set of "joint exhibits" and presented their respective arguments; no witnesses appeared to present live testimony.

1

Admission (Def.'s Admissions), Nos. 1-2; Ex. 8, Def.'s Answers to Interrogatories, Nos. 5-6). The defendant has a limited "working knowledge of agricultural commodity marketing techniques and strategies," (Ex. 7, Def.'s Admissions No. 7), and a familiarity with and an understanding of "the leverage provided in futures and options trading" and the "substantial risk of loss in futures and options trading," (Ex. 9, Customer Account Application, at page 2 of 2). Prior to the events described below, the defendant had placed orders to sell soybeans and other grain crops to the plaintiff by telephoning a representative of the plaintiff and orally agreeing to the terms of a sale. (Ex. 7, Def.'s Admissions No. 12.) He has experience negotiating the terms of basis (i.e., cash market) and price-first (i.e., hedge-to-arrive) contracts. (E.g., Ex. 8, Def.'s Answers to Interrogatories, Nos. 17 and 24.)[2] Both the plaintiff and the defendant are "merchants" within the meaning of Revised Statutes of Nebraska U.C.C. §§ 2-104(1) and 2-201(2). (Ex. 1, Berggren Aff. ¶ 3; Def.'s Trial Br., filing 76, at 1 ¶ 2.) See also Agrex, Inc. v. Schrant, 379 N.W.2d 751, 754 (Neb. 1986) ("Whether defendant . . . met [the] definition [of merchant] was a question of fact . . . .").

On or about September 14, 2007, the defendant placed a telephone call to Jeffrey Berggren, who was then serving as Producer/Marketing Director for ADM, and offered to sell 25,000 bushels of soybeans to the plaintiff at a price of $9.90 per bushel. (E.g., Ex. 2, P Soucie Dep., at 55:25-56:8; see also Ex. 1, Berggren Aff. ¶¶ 3, 6.) The soybeans were to be delivered to the plaintiff's Lincoln, Nebraska, processing facility between June 1, 2008, and July 31, 2008,

---

[2]Jeffrey Berggren, a former employee of ADM, defines hedge-to-arrive contracts as follows:

> Under a hedge-to-arrive contract, delivery of a specified quantity and grade of grain at a specified location and reference price by a specified date within the crop-year during which the crop is harvested is typically agreed upon by verbal commitment followed shortly thereafter by a written confirmation of the agreement. Hedge-to-arrive contracts also allow for "rolling" of reference prices thus allowing the producer to store the grain into a deferred month within the crop year to capture either favorable carry in the futures market or basis improvement in the cash market.

(Ex. 1., Berggren Aff. ¶ 4.)

2

pursuant to a hedge-to-arrive agreement.  (Ex. 1, Berggren Aff. ¶ 5.)   Berggren states that he "accepted and booked this offer and immediately recorded handwritten notes of the agreement reached." (Id.)  He states that, "pursuant to [his] standard practice and procedure[, he] also would have entered the details of the agreement in the ADM computer system at or near the time of [his] telephone conversation with [the defendant] so as to facilitate the creation of a Grain Purchase Contract Confirmation for signature by [the plaintiff] and mailing to [the defendant]." (Id.)  He adds that he "would have also confirmed the acceptance and booking of the purchase with [the defendant] during [the] telephone conversation . . . and provided him with a contract number consistent with ADM practice and procedure." (Id.)[3]  The defendant states that he does not recall Berggren stating specifically, "We've got a deal," or "I accept [your offer]," but he does recall Berggren stating that he would send out a contract, and he "suppose[d]" Berggren accepted the offer.  (Ex. 2, P. Soucie Dep. at 56:23-57:19.)

Berggren states,

It was the policy, practice and procedure of my employer ADM to require its merchandisers to prepare a Grain Purchase Contract Confirmation at or near the time of any agreement for the purchase of grain, including hedge-to-arrive agreements.  This was accomplished by entry of certain material terms and conditions at a computer terminal utilizing software that would thereafter permit ADM support staff to print a formal confirmation document that would be signed by an available merchandiser and promptly mailed on either the same date as entry or within a day or two thereafter.  On September 14, 2007[,] I followed this policy, practice and procedure and based on current information and belief, [Grain Purchase Contract Confirmation P 047344 dated September 14, 2007,] was prepared, processed and mailed to [the defendant] at his last known address . . . by ADM support staff . . . .

(Ex.1, Berggren Aff. ¶ 8.)  In his deposition, Berggren explains that ordinarily a confirmation is printed by a computer, and clerical staff bring the confirmation to the merchandiser for signing. (Ex. 6, Berggren Dep. at 29:3-24.)  The merchandiser then returns the confirmation to the clerical staff for mailing.  (Id. at 30:3-12.)  Berggren states, however, that sometimes the confirmation does not go to the "correct desk," and that in this particular instance, Contract Confirmation P

_____

[3]In his deposition, Berggren states that he did not remember his phone conversation with the defendant on September 14, 2007.  (Ex. 6, Berggren Dep. at 20:15-23, 21:15-23:5.)

047344 was signed by someone other than Berggren.  (Id. at 28:13-20, 29:9-13.)  Thus, it does not appear that Berggren has personal knowledge of whether the confirmation went to the clerical staff for mailing after it was signed, and he admits that he had no personal knowledge whether the contract confirmation was mailed to the defendant.  (Id. at 28:13-30:16.)

A copy of Grain Purchase Contract Confirmation P 047344 has been included in the record.  (See Ex. 1-B at 1.)  The confirmation states that 25,000 bushels of Grade 1 soybeans would be delivered by the defendant between June 1, 2008, and July 31, 2008.  (Id.)  The "final price," which was to be established "by the time of delivery or 6/1/2008, whichever comes first," was "to be $ 9.90000/BU +/- a basis level vs YSB July 2008 CBOT that [would] be established at seller's option based on buyer's posted bid at time of pricing for the shipment terms described" in the confirmation.  (Id.)  The confirmation also assesses "a .04 charge/BU for contracting a [hedge-to-arrive], and allows "one futures roll . . . for another .04 charge."  (Id.)  On its reverse side, the confirmation sets forth several "Terms and Conditions," including the following:

> 1.  Receipt of this Contract by you is an acknowledgement [sic] of acceptance of all terms and conditions herein unless immediate notice is sent to us advising of any errors.  All agreements between the parties hereto must be in writing, and this Contract is a final expression of the agreement between the parties.  Any confirmation by you that is inconsistent with or in addition to the terms and conditions herein shall not be binding unless we expressly approve the inconsistent or additional terms in writing.
>
> . . . .
>
> 8.  We may cancel this Contract and any other contracts we have with you if you fail to comply in any way with the terms and conditions herein.

(Ex. 1-B at 2.)  The copy of the confirmation that is in evidence bears no stamp or other marking indicating that it was mailed.

On or about September 15 or 16, 2007, the defendant spoke with Andy Fiala, a broker at FuturesOne, and told him that he had agreed to sell to the plaintiff 25,000 bushels of soybeans at $9.90 per bushel, with delivery between June 1, 2008, and July 31, 2008, with a "one time roll of 2 cents."  (Ex. 2, P. Soucie Dep. at 58:4-59:6.) In his deposition, the defendant states that was committed to the oral hedge-to-arrive agreement "as long as the conditions that [he and Berggren] agreed to showed up on a contract."  (Id. at 58:11-17.)  The defendant believes that

4

Fiala obtained the contract confirmation number from the plaintiff on or about this same date (i.e., September 15 or 16, 2007). (Id. at 112:12-113:10.) There is no evidence indicating that Fiala obtained a copy of the Grain Purchase Contract Confirmation, however.[4]

On September 16 or 17, 2007, the defendant called Berggren and said that he had not yet received the contract. (Ex. 2, P. Soucie Dep. at 69:2-21.) He added that if he did not receive a written contract, they had no deal, stating, "I need something in writing." (Id. at 72:21-73:5, 74:13-75:6.) Berggren responded, "[W]ell, we'll get one out to you." (Id. at 69:21-22.) Berggren appears to have no recollection of this conversation. (Ex. 6, Berggren Dep. at 30:22-25.)

Sometime within the next couple of weeks, the defendant told Joel Wesely of FuturesOne that he (the defendant) had not received the contract from ADM. (Ex. 5, Wesely Dep. at 14:12-23.) Wesely told the defendant that FuturesOne would call the plaintiff and "try to get them to resend it out." (Id. at 14:23-25.) Both Wesely and Fiala testified that Fiala contacted the plaintiff and asked for the Grain Purchase Contract Confirmation to be re-sent to the defendant. (Ex. 4, Fiala Dep. at 52:1-18; Ex. 5, Wesely Dep. at 14:15-15:5.)

Wesely and the defendant continued to communicate on a weekly basis, but they did not discuss the ADM contract at issue here until June 2008. (Ex. 5, Wesely Dep. at 17:18-18:17.) In June 2008, Wesely called the defendant and told him that they "need[ed] to go ahead and get this basis set." (Id. at 18:21-19:5.) Wesely states, "[The defendant], from the best of my memory, basically just kind of said okay. He didn't say yes or no or anything, he was just like okay." (Id. at 19:6-9.) Within a couple of weeks, Wesely asked the defendant about the matter again, and the defendant responded "that he still never got a contract and that he didn't have anything to deliver." (Id. at 19:13-20.)

On or about June 30, 2008, Berggren called the defendant. (Ex. 6, Berggren Dep. at 37:6-14.) According to Berggren's notes, he talked to the defendant "about his HTA contract," and the defendant "said he had no recollection of doing it." (Ex. 1-C.)

---

[4]On the contrary, Fiala states that he had not seen the contract that "ADM would have . . . sent out" until an attorney showed him a copy before his deposition. (Ex. 4, Fiala Dep. at 6:22-7:6; see also id. at 10:1-10.)

On or about July 1, 2008, a conference call was arranged between the defendant, Fiala, and Berggren.  (Ex. 1, Berggren Aff. ¶ 11; Ex. 4, Fiala Dep. at 49:1-13.)  Berggren told the defendant that it was time to set the basis in their hedge-to-arrive agreement.  (Ex. 1, Berggren Aff. ¶ 11; Ex. 4, Fiala Dep. at 60:3-10; Ex. 2, P. Soucie Dep. at 77:11-13.)  According to Berggren, he and the defendant agreed during this call to "lock-in . . . a final basis level at '-60n' or -0.60000."  (Ex. 1, Berggren Aff. ¶ 11.)  According to the defendant and Fiala, the defendant first responded to Berggren's attempt to establish a basis by stating that he did not have a contract with ADM because he never received the contract confirmation.  (Ex. 2, Soucie Dep. at 77:11-79:18; Ex. 4, Fiala Dep. at 60:13-14.)  Also, both the defendant and Fiala state that the basis remained an unresolved issue at the conclusion of the conversation, though both men did note that Berggren mentioned a basis of "60 under" during the course of the conversation.  (Ex. 2, Soucie Dep. at 77:25-78:16; Ex. 4, Fiala Dep. at 60:15-63:22.)

Shortly after the July 1, 2008, conference call, the plaintiff prepared and mailed to the defendant Grain Purchase Contract Pricing Confirmation P 47344A.  (Ex. 1, Berggren Aff. ¶ 12.)  A copy of this pricing confirmation has been included in the record.  (See Ex. 1-D.)  The confirmation states that 25,000 bushels of Grade 1 soybeans were to be delivered between June 1, 2008, and July 31, 2008, at a "price and freight basis" of 9.300000 per bushel, with a "futures price" of 9.90000 and a "futures basis" of -.60000.  (Id. at 1.)  Like Contract Confirmation No. P 047344, Pricing Confirmation No. P 47344A assesses a .04 charge per bushel for contracting an HTA and allows one futures roll for "another .04 charge."  (Id.)  On its reverse side, Pricing Confirmation No. P 47344A lists terms and conditions that are similar to those appearing on the reverse of Contract Confirmation No. P 047344.  (Compare Ex. 1-B at 2 with Ex. 1-D at 2.)  The first term and condition appearing on the reverse of Pricing Confirmation No. P 47344A states,

> 1. Receipt of this Contract by you is an acknowledgement [sic] of acceptance of all terms and conditions herein unless immediate notice is sent to us advising of any errors.  All agreements between the parties hereto must be in writing, and this Contract is a final expression of the agreement between the parties.  Any confirmation by you that is inconsistent with or in addition to the terms and conditions herein shall not be binding unless we expressly approve the inconsistent or additional terms in writing.  Any objection to this Contract must be provided to ADM within ten (10) days of your receipt.

(Ex. 1-D at 2.)

The defendant received Grain Purchase Contract Pricing Confirmation P 47344A on the following day. (Ex. 2, Soucie Dep. at 80:5-8, 81:6-8.) It is noteworthy that the address for the defendant appearing on Grain Purchase Contract Pricing Confirmation P 47344A is different from the address for the defendant appearing on Grain Purchase Contract Confirmation P 047344. (Compare Ex. 1-B with Ex. 1-D.) Berggren states that after the defendant informed him that he did not receive Contract Confirmation P 047344, he (Berggren) looked up the defendant on-line and updated his address. (Ex. 6, Berggren Dep. at 52:1-53:24.) The defendant states that he has lived at his current address in Deweese, Nebraska, since approximately 1985, that the address appearing on Contract Confirmation P 047344 was his correct mailing address "[p]rior to the change over from box numbers to road addresses," that the address appearing on Pricing Confirmation P 47344A is his current (i.e., correct post-changeover) mailing address, and that he has experienced several problems receiving mail addressed to his route box number after his mailing address changed from a route box number to a road address. (Ex. 2, P. Soucie Dep. at 9:15-20, 11:19-13:22.)

After receiving Grain Purchase Contract Pricing Confirmation P 47344A, the defendant immediately called Berggren and objected to the "60 under" basis, the four-cent hedge fee, and the four-cent roll fee. (Ex. 2, P. Soucie Dep. at 80:12-81:17, 83:4-84:7. See also Ex. 1-C.) According to the defendant, Berggren suggested that ADM could satisfy the defendant's objections, and the defendant expected the plaintiff to provide him with a new written confirmation to verify the agreement he believed he had just reached with Berggren. (Id. at 82:22-84:24, 88:2-90:17.) He received no such confirmation. (Id. at 84:13-85:22, 90:16-24.) The defendant's objections to Grain Purchase Contract Pricing Confirmation P 47344A were made orally over the telephone; he did not provide written objections to ADM. (Ex. 1, Berggren Aff. ¶ 14; Ex. 2, P. Soucie Dep. at 84:8-12.)

On or about August 15, 2008, Berggren mailed a letter to the defendant in which he sought "assurances of performance under the hedge-to-arrive agreement." (Ex. 1, Berggren Aff. ¶ 15; see also Ex. 1-E.) The defendant received the letter, but he did not respond to it in writing. (E.g., Ex. 2, P. Soucie Dep. at 91:17-20, 94:7-9.) He states, however, that he spoke with

7

Berggren on the telephone a day or two before he received this letter.  (Id. at 92:14-25.)
According to the defendant, during this call Berggren stated that "he was expecting delivery of
those beans," and the defendant replied, "I'm not delivering them because I don't have a contract
with you."  (Id. at 93:1-8.)

The defendant did not deliver 25,000 bushels of grain to the plaintiff.  (Ex. 1, Berggren
Aff. ¶ 24.)  The plaintiff obtained soybeans on the open market to replace those that it expected
to be delivered by the defendant.  (Id. ¶ 25.)  In doing so, it incurred $96,937.50 in damages,
which it calculates based on the difference between the cost of the soybeans it expected to obtain
from the defendant (i.e., $9.90 per bushel) and the August 1, 2008, closing futures price for
soybeans (i.e., $13.5775 per bushel), plus a $0.20 per bushel cancellation fee.[5]  (Id. ¶¶ 27-28.)
On or about September 12, 2008, Berggren mailed a letter to the defendant stating that the
plaintiff's contract with the defendant was cancelled and demanding that the defendant make a
payment of $96,937.50 to the plaintiff by September 22, 2008.  (Ex. 1, Berggren Aff. ¶ 19.)  The
defendant received the September 12 letter, but he did not make any response to it.  (Id. ¶ 22; Ex.
2, P. Soucie Dep. at 94:14-95:4.)

Berggren states, "In September[] 2007 the open auction July[] 2008 futures price for
soybeans ranged from a low of $9.310 to a high of $10.4150 per bushel.  In June[] 2008 the open
auction July 2008 futures price for soybeans ranged from a low of $13.470 to a high of $16.070
per bushel.  In July[] 2008 the open auction July 2008 futures price for soybeans ranged from a
low of $15.200 to a high of $16.600 per bushel."  (Ex. 1, Berggren Aff. ¶¶ 30-32.)  In his
deposition, which was taken on February 26, 2009, the defendant stated that the soybeans at issue
in this case remain in storage on his property.  (Ex. 2, Soucie Dep. at 41:14-42:14.)

## II.   ANALYSIS

The alleged contract at issue in this case concerns a sale of grain for a price in excess of
$500.  Therefore, it is governed by Article 2 of the Nebraska Uniform Commercial Code
(U.C.C.).  See, e.g., Neb. Rev. Stat. U.C.C. § 2-102 ("Unless the context otherwise requires, this

---

[5]$13.5775 - $9.90 + $0.20 = $3.8775; $3.8775 per bushel x 25,000 bushels = $96937.50

article applies to transactions in goods . . . ."); Sack Bros. v. Tri-Valley Co-op., Inc., 616 N.W.2d 786, 792 (Neb. 2000) (holding that hedge-to-arrive contracts for sales of grain "are for the sale of goods in excess of $500 and are, therefore, governed by the U.C.C.").

To prevail in this case, the plaintiff must prove, by a greater weight of the evidence, (1) that the plaintiff and the defendant entered into the contract; (2) the terms of the contract; (3) that the defendant breached the contract; (4) that this breach of contract was a proximate cause of some damage to the plaintiff; and (5) the nature and extent of that damage. See 1 Neb. Practice, NJI2d Civ. 15.01 (Thompson-West 2006-07 ed.) See also, e.g., Smith v. Paoili Popcorn Co., 618 N.W.2d 452, 459 (Neb. 2000) (finding no prejudice in instruction stating, "Before the plaintiff can recover against the defendant on his claim of breach of contract the plaintiff must prove by the greater weight of the evidence that the defendant breached the contract . . . and that this breach of contract was a proximate cause of some damage to the plaintiff and the nature and extent of that damage."); Hoeft v. Five Points Bank, 539 N.W.2d 637, 644 (Neb. 1995) ("A party seeking to enforce a contract has the burden of establishing the existence of a valid legally enforceable contract."); Production Credit Ass'n of Midlands v. Eldin Haussermann Farms, Inc., 529 N.W.2d 26, 32 (Neb. 1995) ("In order to recover in an action for breach of contract, the plaintiff must . . . prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty."). In addition to these elements, the plaintiff must prove that the statute of frauds is satisfied. See Neb. Rev. Stat. U.C.C. § 2-201; see also Sack Bros., 616 N.W.2d at 792 (applying U.C.C. § 2-201).

Nebraska's statute of frauds states,

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

Neb. Rev. Stat. U.C.C. § 2-201(1). In this case, there is no evidence of a contract between the parties that has been signed by the defendant "or by his authorized agent or broker." Therefore, even if I assume that a contract was formed between the parties on or about September 14, 2007, the contract is not enforceable unless the plaintiff can establish that an exception set forth in

9

U.C.C. § 2-201 is applicable.[6]

One of the exceptions to the statute of frauds is of particular relevance to this case. Uniform Commercial Code section 2-201(2)(a) states,

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

As noted above, the parties in this case are "merchants" within the meaning of this section. I find, however, that the "writing in confirmation," i.e., Grain Purchase Contract Confirmation P 047344, was not received by the defendant "within a reasonable time." Indeed, I find that Contract Confirmation P 047344 was never received by the defendant, and the exception to the statute of frauds set forth in section 2-201(2)(a) is not satisfied.

At trial, the plaintiff argued that the only evidence supporting the defendant's claim that he did not receive Contract Confirmation P 047344 is "unsupported hearsay." The plaintiff added that the defendant should not be allowed "to deny" the contract based on this unsupported hearsay. Upon questioning by me, counsel elaborated upon the plaintiff's position, arguing that the defendant stated during his deposition that he never received the contract; that this statement is hearsay when offered by the defendant because it is an out-of-court statement offered to prove the truth of the matter asserted; and that the statement is not an admission if offered by the defendant himself (though it would be if offered by the plaintiff).

It is true that the defendant's statement that he did not receive the contract confirmation

_____

[6]When analyzing the plaintiff's motion for summary judgment, I noted that, when the facts are viewed in a light most favorable to the defendant, there is a genuine issue as to whether an oral contract was formed between the parties on or about September 14, 2007. (See Mem. and Order on Pl.'s Mot. for Summ. J., filing 65, at 7-10.) At this stage of the proceedings, the evidence is no longer taken in a light most favorable to the defendant, and the plaintiff is not required to show that there is no genuine issue as to whether a contract was formed between the parties. Rather, as noted above, the plaintiff is required to show only that, based on the greater weight of the evidence, the parties entered into a contract. Nevertheless, it is a close question whether a contract was formed between the parties in September 2007. For the purposes of my analysis, I shall assume that an oral contract was formed on September 14, 2007, and I shall focus on whether that contract is enforceable under the statute of frauds.

10

appears in his deposition.  However, to the extent that the plaintiff means to argue that the defendant's statement cannot be considered because it constitutes inadmissible hearsay, I reject its argument.  The defendant's deposition was offered into evidence by the parties jointly, and it was received without objection from any party, including the plaintiff.  In short, the plaintiff's argument that this portion of the record is inadmissible–if that is indeed what the plaintiff means to argue–is untimely.

Furthermore, I do not agree with the plaintiff's argument that the defendant's own "hearsay" statement is the only evidence showing that he did not receive Contract Confirmation P 047344.  The defendant's position is also supported by evidence that (1) the defendant contacted Berggren on September 16 or 17, 2007, and asked him to re-send the contract confirmation;[7] (2) the defendant contacted Wesely approximately 2 weeks later and told him that he had not received the contract confirmation; (3) Wesely told the defendant that someone at FuturesOne would contact the plaintiff and try to get it to re-send the contract confirmation to the defendant; (4) Fiala contacted the plaintiff and asked it to re-send the contract confirmation to the defendant; (5) although the defendant's physical address did not change, Berggren updated the defendant's mailing address sometime after he believes Contract Confirmation P 047344 was sent to the defendant and before Pricing Confirmation P 47344A was sent to the defendant; (6) after the defendant's mailing address was updated, the defendant promptly received the plaintiff's subsequent mailings; and (7) the defendant experienced problems with his mail service on a number of occasions after his mailing address was changed.  Also, as discussed in more detail in the following paragraph, there is no evidence that Contract Confirmation P 047344 was mailed to the defendant.  All of these facts lend credibility to the defendant's claim that he did not receive Contract Confirmation P 047344.

The plaintiff also argued that a properly-mailed document is presumed to be received by the addressee, and it suggested that the defendant's denial of receipt of the contract confirmation is insufficient to overcome this presumption.  I find, however, that the plaintiff has failed to show that it is entitled to the benefit of the presumption.  Although the plaintiff has submitted evidence

---

[7]The plaintiff argued at trial that this point too is based solely on "the hearsay statement of defendant Soucie."  For the reasons I explained previously, I reject this argument.

that its "policy, practice, and procedure" was to promptly mail confirmation documents, and although Berggren states that he believes that Contract Confirmation P 047344 was mailed to the defendant by an unidentified member of ADM's "support staff," the plaintiff submitted no evidence that the contract confirmation at issue here was, in fact, properly mailed to the defendant in accordance with the plaintiff's standard policy, practice, and procedure.  As the Eighth Circuit explained in Crotty v. Dakotacare Administrative Services, Inc., 455 F.3d 828, 831 (8th Cir. 2006), a party "is not entitled to the general presumption that 'a properly mailed document is received by the addressee'" if there is no proof that the party "placed the letter in the mail."  In other words, evidence that a party has a procedure for mailing contracts is not sufficient to trigger the presumption if the evidence does not show that the procedure was applied in the defendant's particular case.  See Davis v. U.S. Bancorp, 383 F.3d 761, 766 (8th Cir. 2004) ("We apply a presumption that a properly mailed document is received by the addressee.  That presumption may arise based on circumstantial evidence, including testimony by someone familiar with company procedures and practices that the letter was sent." (citation omitted) (emphasis added)); Kennell v. Gates, 215 F.3d 825, 829 (8th Cir. 2000).  Furthermore, I find that even if the plaintiff were entitled to the benefit of the presumption, that presumption has been rebutted by the defendant's evidence of non-receipt of Contract Confirmation P 047344 (summarized in the preceding paragraph).

During trial, the plaintiff suggested that the defendant decided to deny receiving Contract Confirmation P 047344 in July 2008, when he discovered that the "deal was bad for him."  In support of this argument, the plaintiff relies upon Berggren's statement (summarized in Part I above) that the July 2008 futures price for soybeans rose from a low of $9.310 in September 2007 to a high of $16.070 in July 2008.  (Ex. 1, Berggren Aff. ¶¶ 30-32.)  The evidence shows, however, that the defendant told Berggren in September 2007-- before the alleged profit-based motive to lie arose–that he had not received the contract confirmation, and he continued to deny receiving the document throughout the time period relevant to this litigation.  Furthermore, the fact that the defendant maintained possession of the soybeans into at least February 2009 belies the plaintiff's suggestion that the defendant lied about his lack of receipt of the contract confirmation in order to secure a greater profit on the soybeans in July 2008.  These facts, taken

12

together with the lack of evidence that the Contract Confirmation was actually mailed to the defendant, lead me to reject the plaintiff's attack upon the defendant's credibility on this issue.

The plaintiff argues next that U.C.C. § 2-201(2)(a) is satisfied because the defendant received Pricing Confirmation P 47344A within a reasonable time of the forming of the oral contract.  (See, e.g., Pl.'s Br. in Supp. of Mot. for Summ. J., filing 49, at 25; Pl.'s Trial Br., filing 74, at 1 (incorporating the plaintiff's summary judgment arguments); see also filing 74 at 9.) Even if I assume that Pricing Confirmation P 47344A constitutes a "writing in confirmation" of the September 14, 2007, agreement, however, the evidence shows that the pricing confirmation was not received by the defendant within a reasonable time.  As I explained in my memorandum and order on the plaintiff's motion for summary judgment,

> In Kimball County Grain Co-op v. Yung, 263 N.W.2d 818, 820 (Neb. 1978), the Nebraska Supreme Court held that a written confirmation that was received more than six months after the parties made an oral contract to sell 15,00[0] bushels of wheat was not received "within a reasonable time" for the purposes of U.C.C. section 2-201(2).  In Yung, the plaintiff offered no excuse for the six-month delay, and the court observed that "the written contract was delivered to the defendant only 1 day before the final possible date of delivery under the oral contract."  263 N.W.2d at 820.  The court found that under these circumstances, and in light of the basic purposes of section 2-201(2), there was "no doubt that the defendant in this case did not receive a writing in confirmation of the oral contract within a reasonable time."  Id.
>
> In the instant case, the parties allegedly entered into an oral contract on September 14, 2007, and the defendant did not receive a writing in confirmation of the contract until sometime after July 1, 2008.  There is evidence that the plaintiff was informed repeatedly that the defendant did not receive a written confirmation of the agreement, yet the plaintiff has offered no excuse for the delay.  The evidence also indicates that because of the nine-month delay, the defendant did not receive a written confirmation of the agreement until after the delivery window contemplated by the parties had opened.  Under the circumstances, I am not persuaded that the requirements of section 2-201(2)(a) are satisfied.

(Filing 65 at 12.)

The plaintiff argues that the instant case is distinguishable from Yung because the defendant did not receive Pricing Confirmation P 47344A "only 1 day before the final possible date of delivery under the oral contract."  263 N.W.2d at 820; (see also Pl.'s Trial Br., filing 74,

at 9.)  It also argues that "[t]here is no bright-line rule for what is a reasonable time to send a confirmation writing between a merchant-farmer and merchant-buyer of grain under § 2-201." (Pl.'s Trial Br., filing 74, at 9 (citing Conagra, Inc. v. Nierenberg, 7 P.3d 369 (Mont. 2000).)   It is true that when the defendant received the pricing confirmation, more than one day remained in the delivery window that the parties established on September 14, 2007.  I do not see that this distinction renders the plaintiff's unexplained delay "reasonable" within the meaning of U.C.C. § 2-201(2), however.  Pricing Confirmation P47344A was not received by the defendant until approximately one month after the June 1, 2008, deadline for establishing the "final price."  (See Ex. 1-B at 1.)  Also, the nine-month delay between September 14, 2007, and July 1, 2008, is 50% greater than the six-month delay that the Nebraska Supreme Court held to be "no doubt" unreasonable in Yung, and the plaintiff has referred me to no case wherein such a lengthy delay was deemed reasonable.  In Conagra Inc. v. Nierenberg, 7 P.3d 369, 383-84 (Mont. 2000), which the plaintiff cites in support of its argument that no "bright-line rule" defines what is reasonable for the purposes of U.C.C. § 2-201(2), the court held only that a ten-day delay is not unreasonable.  I find, as a matter of law, that Pricing Confirmation P 47344A was not received by the defendant within a reasonable time of September 14, 2007.  And I remain persuaded that the exception to the statute of frauds set forth in U.C.C. § 2-201(2)(a) is not applicable in this case.

The plaintiff argues that, even if section 2-201(2)(a) does not apply in this case on the ground that the defendant is not a merchant, the exception to the statute of frauds set forth in section 2-201(2)(b) is applicable.  (E.g., Pl.'s Proposed Findings of Fact & Conclusions of Law, filing 73, at 20; Pl.'s Trial Br., filing 74, at 7-8.)  Section 2-201(2)(b) states,

> Between a merchant and a buyer or seller of grain not a merchant, if (i) the contract is an oral contract for the sale of grain, (ii) within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received, (iii) the party receiving it has reason to know its contents, (iv) it contains a statement of the kind of grain, quantity of grain, per unit price, date of contract, and delivery date of the grain, and (v) notice appears on the face of the written confirmation stating that the contract will be enforceable according to the terms contained in the confirmation unless written notice of objection is given within ten days, the writing satisfies the requirements of subsection (1) of this section against the party receiving it unless written notice of objection to its contents is given within ten days after it is received.

14

I have found that both of the parties to this action are "merchants" within the meaning of the U.C.C. Moreover, like section 2-201(2)(a), section 2-201(2)(b) requires the plaintiff to show that the defendant received a writing in confirmation of the contract "within a reasonable time." For the reasons discussed in my analysis of the applicability of section 2-201(2)(a), I find that section 2-201(2)(b) is not applicable in this case.

The plaintiff argues, "Even if this Court is not persuaded that the Statute of Frauds under §§ 2-201(a) and (b) was satisfied by the September 14, 2007, [Contract Confirmation P 047344], it was satisfied by the July 1, 2008[, Pricing Confirmation P47344A]." (Pl.'s Proposed Findings of Fact & Conclusions of Law, filing 73, at 21.) It continues,

> On July 1, 2008[,] ADM, Soucie, and Fiala held a meeting by telephone to establish a basis level for final pricing of the soybeans pursuant to the express terms of the hedge-to-arrive agreement "committed to" by Soucie in September 2007. This meeting further evidenced that the original oral contract of September 14, 2007[,] was still in effect. Likewise, the meeting ratified the earlier agreement and by further oral agreement added an additional term for a final basis level. Proof of this agreement is found in the fact that defendant Soucie received the written memorandum confirming pricing the day following the telephone conference call and he read at least the front page of the July 1, 2008[,] Grain Purchase Contract Pricing Confirmation P 47344A. This writing and its contents satisfied both §§ 2-201(2)(a) and (b) (i.e., the Statute of Frauds is satisfied whether Soucie is considered a merchant or simply a buyer or seller of grain).

(Id.) I find, however, that the plaintiff's claims that the July 1, 2008, telephonic meeting "evidenced that the original oral contract of September 14, 2007, was still in effect" and "ratified the earlier agreement" while adding a new term are contrary to the greater weight of the evidence. Although Berggren's notes indicate that Berggren believed that the parties agreed to a basis of "-60n" during the telephonic meeting, both Fiala's and the defendant's testimony shows that there was no meeting of the minds on this point. Furthermore, both Fiala and the defendant testified that the defendant maintained during this meeting that no contract had been formed between the parties due to the plaintiff's failure to provide a written confirmation of the September 14, 2007, agreement. In short, I find that Pricing Confirmation P 47344A does not satisfy sections 2-201(2)(a) or (b) with respect to the oral agreement of September 14, 2007, and it does not serve as a writing in confirmation of an oral agreement made on July 1, 2008, because no oral agreement was reached on that date.

15

Finally, the plaintiff argues that even if the exceptions to the statute of frauds set forth in U.C.C. sections 2-201(2)(a) and (b) are not satisfied, the exception set forth in section 2-201(3)(b) applies in this case.  That section states,

> (3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable
>
> . . . .
>
> (b) if the party against whom enforcement is sought admits in his or her pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted . . . .

Neb. Rev. Stat. U.C.C. § 2-201(3)(b).  As I stated in the memorandum and order on the plaintiff's motion for summary judgment,

> Section 2-201(3)(b) contains at least three requirements: "There must be an admission; the admission must be made by the party against whom enforcement of the oral contract is sought; and the admission must be made in court."  Nebraska Builders Products Co. v. Industrial Erectors, Inc., 478 N.W.2d 257, 268 (Neb. 1992).  "The statutory requirement can be satisfied by way of pleadings, bills of particulars, depositions, affidavits, admissions pursuant to notices to admit, and oral testimony, including admissions made on cross-examination."  Id. (citation omitted).  Also, an admission within the meaning of § 2-201(3)(b) can be made either explicitly or by testimony "to facts which as a matter of law establish that a contract was formed."  Id. (citation omitted).  An admission is not made, however, "whenever the defendant utters the magic words contract or agreement."  Id. at 269.  The Nebraska Supreme Court explains, "We acknowledge the possibility that laypeople might misuse legal terminology.  We therefore suggest that if a party denying the existence of a contract uses contract terminology, the court should look at the other evidence presented by the defendant."  Id.

(Filing 65 at 13-14.)

The defendant's alleged admissions that a contract was formed between the parties are itemized in my memorandum and order on the plaintiff's motion for summary judgment, and they need not be repeated here.  (See filing 65 at 14-18.)  When certain of the defendant's statements are taken out-of-context, they may be made to appear to be admissions that a contract was formed between the parties on September 14, 2007, or admissions "to facts which as a matter of law establish that a contract was formed" on that date.  For instance, the defendant

16

admits that he called the plaintiff on September 14, 2007, and offered to sell 25,000 bushels of soybeans to the plaintiff at $9.90 per bushel with delivery to be made between June 1, 2008, and July 31, 2008.  (E.g., Ex. 7, Def.'s Admissions No. 18.)  Furthermore, he frequently used "contract terminology" when describing this arrangement, describing it as "an HTA contract" that he "committed to" or "agreed to,"or a "deal" or "agreement" that he "thought we had . . . going."  (See filing 65 at 14-18.)  The defendant also testified explicitly, however, that he believed he did not have a binding agreement with ADM because he never received the written contract confirmation.  (E.g., Ex. 2, P. Soucie Dep. at 50:4-22.)  In short, his alleged admissions are qualified by testimony that he believed there was no binding agreement, or "deal," in the absence of a written contract.  (E.g., Ex. 2, P. Soucie Dep. at 50:4-22, 58:4-60:19, 63:17-64:14.)

As noted above, the rule in Nebraska is that "if a party denying the existence of a contract used contractual terminology," as is true in this case, "the court should look at the other evidence presented by the defendant."  Nebraska Builders Products Co. v. Industrial Erectors, Inc., 478 N.W.2d 257, 269 (Neb. 1992).  In Nebraska Builders, Timothy Brennan, who served as the defendant's sales manager, made the following statement while being cross-examined:

> Q  At the meeting on October 14th in Chicago you specifically told Mr. Hawkins, did you not, either you or Mr. Cole, that Industrial Erectors would not perform or supply any cranes on this project unless it received compensation somewhere in the neighborhood of $150,000.00 more than that set forth in its bid, isn't that correct?
>
> A  I believe it was stated, if the order was to be as per specified with the electrical circuitry and everything lese, that there would be an increase to the contract.

478 N.W.2d at 268 (emphasis in original).  The court held that "Brennan's testimony, considering the circumstances presented at trial, established the existence of an oral contract." Id. at 269 (emphasis added).  Elaborating, the court explained that Brennan's statement was not an admission of the existence of a contract merely because he used "the magic word[] contract." Id.  Instead, the court considered the conduct of the defendant and concluded that it "indicate[d] that an agreement between the parties existed" and demonstrated that Brennan's testimony was "an admission, and not an inadvertently mistaken use of legal terminology."  Id.  Specifically, the court noted,

17

> The record in this case shows that Brennan admitted submitting variance approval documents to Nebraska Builders shortly after the alleged agreement occurred. He also admitted that he sent a letter advising Nebraska Builders that Industrial would adhere to the specifications. In addition, Brennan testified that he visited Omaha and was looking for more commitment from Nebraska Builders in the form of a letter of intent or purchase order. Brennan's conduct indicates that an agreement between the parties existed.

Id.

The plaintiff argues that the instant case is similar to Nebraska Builders because here, as in Nebraska Builders, the defendant repeatedly requested a written contract from the plaintiff. (See Pl.'s Trial Br., filing 74, at 11-12.) It is true that the Nebraska Supreme Court considered Brennan's requests for a writing to be evidence that Industrial "was looking for more commitment from Nebraska Builders," which in turn supported a finding that Industrial admitted that an agreement existed. It is also true that in the instant case, Mr. Soucie repeatedly sought a written contract confirmation from the plaintiff. In contrast to Nebraska Builders, however, here the defendant consistently maintained that there was no binding contract without the written agreement, and he informed Berggren as much on or about September 17, 2007. Furthermore, the defendant's statements and conduct in this case clearly differ from Brennan's conduct in Nebraska Builders, as Brennan took a number of actions showing that Industrial believed a binding contract was formed between the parties despite the absence of a written agreement. In short, I am not persuaded that the defendant's requests for a written contract support a finding that his testimony should be taken as an admission of the existence of a binding contract.

Indeed, it seems to me that virtually all of the defendant's conduct in this case was consistent with the understanding that he attempted to convey in his discovery responses and deposition testimony, i.e., that the transaction that the parties had discussed orally in September 2007 was not binding in the absence of a written contract. The defendant informed Berggren, Fiala, and Wesely that he had not received a written contract and that there was "no deal" in its absence. In fact, he raised this point during almost every conversation that he had concerning the transaction at issue in this case, and on each of the occasions when he discussed the transaction without specifically referring to the absence of a written confirmation, he did raise the matter in a

18

subsequent conversation.[8]  Also, there is no evidence that the defendant made any effort to set a basis level to consummate the deal, despite the fact that the deadline specified in Contract Confirmation P 047344 for setting the "final price" lapsed.  Although the defendant participated in a conference call that Berggren arranged to set the basis, the defendant reiterated during that call that there was no binding contract and he did not agree to the basis proposed by the plaintiff. Finally, there is no evidence that the defendant took any steps toward completing the delivery of the soybeans.  In short, the defendant did not engage in conduct that would support a finding that his testimony and discovery responses should be taken as an admission that a binding contract was formed between the parties.

At trial, the plaintiff conceded that the facts of Nebraska Builders are distinguishable from those of the instant case, stating that it was not "appropriate" to compare the factual circumstances of the cases because a different "level of communication" is used in the grain-selling business.  Counsel stated that "the business works" in this way: "You make the telephone call, the deal is done, you should be getting a confirmation in the mail."[9]  I take counsel's point to

---

[8]There appear to be two instances when the defendant discussed the transaction without stating specifically that there was no binding contract because he had received no written confirmation.  First, there is evidence that on September 16 or 17, 2007, the defendant called Andy Fiala and told him that he had just agreed to the transaction.  Although the plaintiff testified that it was his understanding at the time that no contract existed without a written agreement, it is not clear that he discussed this understanding with Fiala on September 16 or 17. Within two weeks, however, the defendant contacted FuturesOne and informed them explicitly that he needed the written confirmation from the plaintiff.

Second, there is evidence that Wesely called the defendant in June 2008 and discussed the need to get the basis set, and to the best of Wesely's recollection, the defendant simply responded, "Okay."  Within approximately two weeks, however, Wesely raised the matter again, and the defendant responded that he never received the contract and had nothing to deliver to the plaintiff.

[9]I note parenthetically that counsel's suggestion that the written confirmation was a component of the way "the business works" is consistent with the plaintiff's standard policy, practice and procedure of preparing contract confirmation documents and promptly mailing them to the seller.  Also, as noted above, Contract Confirmation P 047344 states specifically that "[a]ll agreements between the parties hereto must be in writing," which too is consistent with the

be that, because of the way in which grain transactions are conducted, the plaintiff should not be required to show that Mr. Soucie engaged in the same conduct that Industrial engaged in in Nebraska Builders. I agree that the plaintiff need not show that the defendant engaged in the very same acts that supported the Nebraska Supreme Court's finding that Brennan made "an admission, and not an inadvertently mistaken use of legal terminology." 478 N.W.2d at 269. In this case, however, the defendant's conduct overwhelmingly supports a finding contrary to the plaintiff's position: the defendant consistently maintained that he did not have a binding contract in the absence of the written confirmation–despite his use of contract language when asked to describe or label the September 14, 2007, telephone discussion–and his conduct indicates that his use of legal terminology was inadvertent and should not be taken as an admission that a binding contract existed between the parties.

The plaintiff argues that, because the defendant is a "merchant" within the meaning of the U.C.C., he cannot benefit from the Nebraska Supreme Court's reasoning in Nebraska Builders. The plaintiff states, "The court's reasoning [in Nebraska Builders] . . . clearly indicates that if a sophisticated party that deals with terminology related to contracts on a regular basis uses such words in an admission before the court, it is sufficient to establish that a contract has been made. A merchant under the UCC would be a person possessing such experience and knowledge." (Pl.'s Trial Br., filing 74, at 13-14.) I agree that the defendant is a merchant, and he has knowledge and skill with respect to the selling of grain. I also agree that the Nebraska Supreme Court's reasoning in Nebraska Builders is based on its recognition of "the possibility that laypeople might misuse legal terminology." 478 N.W.2d at 269. I do not agree, however, that the Nebraska Supreme Court's reasoning in Nebraska Builders applies only to non-merchants, or that its reasoning is otherwise inapplicable to the defendant due to his experience as a merchant. In the first place, there is no indication that the sales manager who made the admission in Nebraska Builders received the benefit of the court's reasoning because he was not "sophisticated" within his business. The court's reference to "laypeople" clearly refers to people

---

plaintiff's description of the way "the business works." Of course, these facts are also consistent with the defendant's position that no binding contract was formed without the written confirmation.

who "might misuse <u>legal</u> terminology." (Emphasis added). Although the defendant is a merchant who has considerable experience with certain types of business transactions involving sales of grain, there has been no showing that he has familiarity with the legal implications associated with terms such as "contract" and "agreement" as they are used in the U.C.C.[10] In short, given the absence of evidence that the defendant has knowledge, experience, or training that makes him unlikely to misuse legal terminology when describing his business dealings, I see no reason to limit the applicability of <u>Nebraska Builders</u>.

The plaintiff also refers me to <u>URSA Farmers' Cooperative v. Trent</u>, 374 N.E.2d 1123 (Ill. App. Ct. 1978), arguing that Mr. Soucie made statements that are virtually identical to those that the Appellate Court of Illinois deemed to be admissions within the meaning of U.C.C. § 2-201(3)(b). In <u>Trent</u>, the parties agreed that the defendant called "some person at plaintiff's elevator," and the "defendant admitted that he discussed with the person at the elevator . . . [a] sale of 2500 bushels of beans at $4.01 per bushel." 374 N.E.2d at 1124. Although the defendant "did not admit that he agreed to make the sale," he "did admit that in a previous discovery deposition, he had testified, 'Whoever I talked to, I contracted 2500 bushels of beans' and when asked as to the price said, 'I signed up for 2500 bushels of beans at 4.01.'" <u>Id.</u> There is no indication that this admission was qualified, limited, or explained in any way, and evidently no testimony was offered in contravention of the admission. Nor is there any discussion of whether the defendant engaged in any conduct that suggested, one way or the other, whether his statements constituted an admission or a misuse of legal terminology. The defendant argued only that the admission was not within the exception to the statute of frauds because it was

---

[10]At trial, plaintiff's counsel suggested that the term "contracted" is not "legal terminology" according to the Nebraska Supreme Court and <u>URSA Farmers' Cooperative v. Trent</u>, 374 N.E.2d 1123 (Ill. App. Ct. 1978), which is cited favorably in <u>Nebraska Builders</u>. <u>See</u> <u>Nebraska Builders</u>, 478 N.W.2d at 269. In <u>Trent</u>, which I discuss in more detail below, the Appellate Court of Illinois did not apply the Nebraska Supreme Court's reasoning that a party's actions ought to be considered to determine whether his alleged admission is merely a misuse of legal terminology. Moreover, <u>Trent</u> clearly does not stand for the proposition that "contracted" is not a legal term. Indeed, it stands for the opposite proposition. In this case, as in <u>Trent</u>, the plaintiff argues that the terms used by the defendant to describe his business dealings have legal significance as an admission; ADM's suggestion that the relevant terms are not "legal terminology" seems to undermine its own position.

21

"involuntary." Id. at 1124-25.   The court held that "the trial count properly determined that the defendant had made an in-court admission of an oral contract for the sale of beans." Trent, 374 N.E.2d at 1125.

In the instant case, Mr. Soucie never admitted that he entered into an enforceable contract with the plaintiff.   Though he used contract language when describing his dealings with Berrgren on September 14, 2007, he also consistently stated that he believed no binding contract existed in the absence of a written contract.   One can analogize Mr. Soucie's testimony to the admissions made by the defendant in Trent only by disregarding context and selecting certain statements to emphasize.   Also, as I noted in footnote 10 above, there is no indication that the court in Trent considered the relevant circumstances to assess whether the defendant inadvertently used contract terminology, as the Nebraska Supreme Court counsels in Nebraska Builders.   In short, Trent applied a different legal rule in an analysis of a significantly different set of statements, and I am not persuaded that its holding ought to govern my analysis here.

The plaintiff submits that, if the defendant prevails in this case, then Nebraska Builders, Trent, and the "admissions" exception to the statute of frauds are meaningless.   For the reasons explained above, I disagree.   In this case, the defendant insisted upon the confirmation writing contemplated by the parties themselves and described in the statute of frauds exceptions set forth in U.C.C. sections 2-201(2)(a) and (b).   I have found that the plaintiff failed to provide this written confirmation to the defendant despite a number of requests.   I have also found that the defendant's statements and actions demonstrate that he did not believe a binding contract existed in the absence of the written confirmation.   Given these facts, the exception set forth in U.C.C. section 2-201(3)(b) is inapplicable.

The plaintiff has failed to show, by a preponderance of the evidence, that an enforceable contract exists between the parties: There is no writing that satisfies the formal requirements of the statute of frauds, the elements of section 2-201(2)(a) and (b) are not satisfied because the defendant did not receive a writing in confirmation of the contract within a reasonable time, and the defendant did not admit that a binding contract was formed on September 14, 2007.

22

**IT IS THEREFORE ORDERED** that judgment shall be entered in favor of the defendant.

Dated September 23, 2009.

BY THE COURT


s/ Warren K. Urbom
United States Senior District Judge